Peter A. Quinn, J.
These two motions under calendar No. 10 of February 9, 1973 and No. 43 of March 5, 1973 are consolidated for disposition.
Petitioners Kerr and Leventhal, in their respective capacities as New York City Housing and Development Administrator and as Commissioner of the Department of Rent and Housing Maintenance, apply, pursuant to article 78 of the CPLR, for a judgment declaring chapter 1012 of the Laws of 1971 (amdg. Local Emergency Housing Rent Control Act, L. 1962, ch. 21, § 1, subd. 5) unconstitutional, and vacating and annulling the respondents’ determination by which Amendment No. 33 of the New York City Rent, Eviction and Rehabilitation Regulations was denied approval.
In the exercise of discretion, the application of Joseph Rothfield, a tenant at 424 East 52nd Street, New York City, for leave to intervene as a petitioner in this action is granted. By order of this court on February 7, 1973 leave to intervene *954 was granted to 241 East 22nd Street Corp. as a landlord intervenor-respondent.
The part of chapter 1012 of the Laws of 1971 pertinent to this case provides that: “ No housing accommodation's presently subject to regulation and control pursuant to local laws or ordinances adopted or amended under authority of this subdivision shall hereafter be by local law or ordinance or by rule or regulation which has not been theretofore approved by the state commissioner of housing' and community renewal subjected to more stringent or restrictive provisions of regulation and control than those presently in effect.”
In the absence of a showing of denial of due process, or equal •protection of the laws, directly affecting petitioners (Matter of Posner v. Rockefeller, 33 A D 2d 314, 316, affd. 26 N Y 2d 970), the question of the constitutionality of this statute may not be raised by them as governmental functionaries seeking to strike down a statute which purports to restrict their authority. (Board of Educ. v. Allen, 20 N Y 2d 109, dissenting opn., p. 118; Kerr v. Urstadt, 72 Misc 2d 942.) Assuming, however, that the intervenor-petitioner may properly raise the question, the arguments advanced in support of the proposition that the statute is an unlawful delegation of the legislative power do not impress as of sufficient weight to overcome the presumption of constitutionality beyond a reasonable doubt. (Matter of Van Berkel v. Power, 16 N Y 2d 37, 40.) The authority given the respondents by this statute is to review the rule promulgations of petitioners and make a factual determination of comparative stringency.
The critical issue is whether respondents have arbitrarily or capriciously exercised their power to withhold approval of a rule of petitioners, properly subject to review, rather than for “ good and valid reasons ”. (Matter of 241 East 22nd St. Corp. v. City Rent Agency, 39 A D 2d 453, 455.) The questions arising from the conflicting exercise of the rule-making and rule-reviewing powers, as between these governmental agencies, are properly before this court, as is the construction of the underlying local law on which the rule-making power depends. (Matter of Saratoga Springs Mun. Civ. Serv. Comm. v. New York State Civ. Serv. Comm., 70 Misc 2d 744.)
Amendment No. 33, effective January 1, 1972, amends section 33 of the Bent, Eviction and Behabilitation Begulations by adding a new subdivision e of section 33 and revoking and adding a new section 33.5. The new subdivision e of section 33 pertains to the apportionment of increases, obtained under *955 sections 33.5 (hardship increase), 33.6, 33.7 and 33.8 of the rent regulations, to the various rent-controlled apartments. The amount of increase is limited by section 26 of the rent regulations which, as mandated by paragraphs (5) and (6) of subdivision a of section Y51-5.0 (Administrative Code of City of New York, tit. Y; Local Laws, 1970, No. 30 of City of New York), limits the increase to 7%% a year on the maximum rent collectible. Thus, the collectibility of the increase is limited to those controlled accommodations which have not yet attained their maximum base rent (MBE). No increase could be apportioned to an accommodation which had reached its MBE until a new MBE was established for that accommodation. Section 25 provides for a biennial adjustment of MBEs. Section 33.5 provides that “a landlord may file an application for an increase in maximum rents on the ground that the current Maximum Gross Building Rental established pursuant to Sections 24 or 25 of these regulations does not equal ”. (Italics added.) This subordinates the old hardship increase to the MBE formula. That is, the maximum gross building rental would have to be established before a hardship increase application could be entertained.
It is petitioners’ contention that the so-called hardship grant provided under the ‘1 net annual return ’ ’ provision of Local Law No. 30 of the Local Laws of 1970 of the City of New York, when that statute is properly construed, is not a separate, parallel avenue to rent increases, but a subordinate adjunct to the MBE formula and that rent increases due to a hardship increase cannot be apportioned to accommodations that have reached their MBE. The respondents maintain that petitioners acted without statutory authority in promulgating Amendment No. 33 and it is therefore void or, in the alternative, that the respondents withheld approval of Amendment No. 33 for “ good and valid reasons ”.
It is not disputed that after long, intensive studies and research by acknowledged experts and consultants in the field of urban housing, and full exploration of such studies and reports and all shades of opinion at extensive public hearings, Local Law No. 30 of the Local Laws of 1970 of the City of New York was enacted for the purpose of establishing a. uniform, city-wide system of rent control which would be as fair as possible to all landlords and all tenants and make it attractive for the owners of realty to arrest the serious blight of abandoned buildings menacing housing in the City of New York. This was to be accomplished under the legislative scheme, by an adjusted series of immediate, transitory increases in rent for *956 all rent-controlled tenants so as to establish a uniform system of base rents which would become the starting point for the MBB formula. .The MBB increases were to be initiated, computed and projected for years to come by the city rent commission’s use of a scientifically-evolved, standardized formula (the maximum base rents formula: a cost index to controlled rents) to the end that all landlords would receive the automatic benefit of a fair rate of return without the need of individualized hardship application proceedings where (under the old regulations) success too often depended on the financial ability to command a specialized force of legal and accounting experts. In no other way could landlords, for whom the long, involved, expensive process of seeking hardship increases was too formidable an obstacle, be encouraged to hang on as interested managers of badly needed housing accommodations.
"While it cannot be said that Local Law No. 30 of the Local Laws of 1970 of the City of New York mandated, in so many words, Amendment No. 33 of the rent regulations, it is clear that the city rent commission was charged with the duty of reconciling and harmonizing all provisions of the statute so as to most efficiently and expeditiously effect the transition to the full operation of the MBB system of rent control. (Local Laws, 1970, No. 30 of City of New York; Administrative Code, § Y51-5.0, subd. g, par. [1].) It is also clear that, in the promulgation of Amendment No. 33, the city rent commission was faithfully carrying out the legislative purpose and acting well within the statutory grant of power.
It seems inescapable that the whole intendment of Local Law No. 30 of the Local Laws of 1970 of the City of New York is to give overriding importance to the fullest and earliest launching of a single, uniform MBB system and thus implicitly to subordinate any interfering or diverse considerations to that paramount purpose. But this does not necessarily mean that an MBB increase excludes the possibility of an additional later increase predicated on hardship. Section 33.5, in fact, does provide for such an increase if the actual expenses are more than the formula expenses.
As set out in the legislative memorandum submitted in support of the enactment of Local Law No. 30 of the Local Laws of 1970 of the City of New York which preceded the enactment of chapter 1012 of the Laws of 1971: “ The hardship formula uses the MBB formula to determine ‘ hardship. ’ Thus, as a practical matter, grants will occur in those buildings where the owner’s OM (Operating and Maintenance) expense exceeds that allowed pursuant to the OM formula ”,
*957 Much of the dissatisfaction with petitioners’ Amendment No. 33 really springs from the delay entailed in the prodigious task of computing MBB rents for all apartments. This delay has made uncertain the number of controlled units which have reached their MBB, thus rendering entirely speculative the number of buildings which may be retarded in achieving an 8%% return, due to collectibility, as well as the length of time it may take them to achieve it. It has also deferred the processing of applications for additional increases based on persisting hardship. The adverse effects of this delay seem to have been greatly ameliorated, if not entirely eliminated, by the amendment of section 32 of the regulations which authorizes the property owner to demand and collect the increased rents he claims in his hardship application and to hold them in an escrow account pending final determination by the rent agency.
It is estimated that the MBB system applies to approximately. 65,000 buildings comprising some 1,054,000 apartments in the City of New York. The number of apartments or buildings where the owners are adversely affected by Amendment No. 33 is unknown and unestimated, but it is an important factor to be considered in any reasonable attempt to determine whether or not the generalized effect of Amendment No. 33 is more stringent or restrictive than pre-existing controls. Also unknown, and equally important, is the number of property owners who could immediately receive increases of up to 7%%, even though they were already realizing an 8%% return on their investment but whose efficient management has kept their actual operation and maintenance expense below the standardized allowances, a result not attainable under the old rent regulations. This is in addition, of course, to what must be by far the majority of property owners who have or will soon receive automatic increases under the MBB system.
Understandable impatience with the inevitably slow process of completing a monumental clerical task should not furnish a ground for dismantling a uniform system of reform established to benefit all controlled housing in the City of New York. Striking down Amendment No. 33 by denying it approval will compel the New York City rent commission to process hardship applications on an equal if not preferential basis, separate and apart from the implementation of the MBB program and increase rents above the MBB. This will completely frustrate the announced legislative purpose and revoke the 1970 statutory, positive injunction laid upon the rent commission to “ promulgate * * * such regulations [as] can be put into effect *958 without general uncertainty, dislocation and hardship [regulations] designed to maintain a system of rent controls at levels which, in the judgment of such agency, are generally fair and equitable and which will provide for an orderly transition from and termination of emergency controls without undue dislocations, inflationary price rises or disruption.” (Administrative Code, § Y51-5.0, subd. g, par. [1], added by Local Laws, 1970, No. 30.) (Emphasis added.)
It is in the light of such large, many-faceted considerations of city-wide scope involving the general good that Amendment No. 33 must be examined, analyzed, considered and judged for the qualities of stringency and restrictiveness. That it will be found to have imperfections causing it to pinch and bind in particularized instances is only the hallmark of its human origins and not valid criteria on which to condemn it.
Respondents in their letter of January 15, 1973, withholding approval of Amendment No. 33, make the finding that, “It appears that a significant effect of the amendment would be to bar a limited rent increase of up to seven -and one-half percent which is warranted under the present provisions of Section 33.5, 6, 7 or 8 of the regulations. No alternative provision is made to compensate the owner for loss of the rent to which he is entitled under the present regulations.”
There is no suggestion that the State Commissioner has conducted any study or inquiry to determine whether this theoretical result affects 1%, 5%, or 10% of the 65,000 buildings involved, nor is there any suggestion that if 99% or 95% or 90% of the one million-odd apartments involved were benefited in terms of the highly desirable purpose of the statute there is nevertheless a degree of stringency and restrictiveness justifying disapproval.
It may be said in passing, as has been noted above, it also appears that an opposite effect of the amendment would be to afford increases of up to 7%% where an 8%% investment return is already béing realized — an advantageous result for property owners which the old regulations more stringently and restrictively bar.
Such suppositious effects, of unknown numerical magnitude, are not valid findings upon which to determine that Amendment No. 33 is, or is not, more stringent and restrictive than present controls. Such speculations are more in keeping with the arbitrary exercise of an absolute veto power than the judicious marshalling and weighing of the whole complex of relevant factors which must enter into a decision based on good and valid reasons.
*959 If the Legislature, in enacting chapter 1012 of the Laws of 1971, did not have in mind the greatest good for the greatest number, then a single example of Amendment No. 33 being more stringent or restrictive would qualitatively make it hopelessly vulnerable to respondent’s disapproval. But if, as it appears to this court, it was the aim of the Legislature to have stringency and restrictiveness determined broadly on a quantitative basis, the finding of respondents being wholly without sufficient factual support is not founded on good and valid reasons.
Chapter 1012 of the Laws of 1971 is declared constitutional and the arbitrary determination of the respondent State Commissioners is vacated and annulled.